## BATES v. UNITED STATES.
### No. 6992.

Circuit Court of Appeals, Seventh Circuit.
Dec. 22, 1939.

Writ of Certiorari Denied Feb. 26, 1940.

See 60 S.Ct. 591, 84 L.Ed. ——.

Herbert Pope, Francis H. Uriell, and Ferris E. Hurd, all of Chicago, Ill., for appellant.

Samuel O. Clark, Jr., Asst. Atty. Gen., Ellis N. Slack, Sewall Key, and Edward First, Sp. Assts. to Atty. Gen., and William J. Campbell, U. S. Atty., and David L. Bazelon, Asst. U. S. Atty., both of Chicago, Ill., for appellee.

Before EVANS, TREANOR, and KERNER, Circuit Judges.

TREANOR, Circuit Judge.

This action was brought in the District Court to recover a refund of $7,134.17 which appellant claims was erroneously and illegally collected from him as income tax for the calendar year of 1935. This appeal is from a judgment in favor of the appellee.

The ultimate question is whether the plaintiff-appellant realized a taxable gain from a sale in 1935 of certain securities which he had purchased during the period of 1931 to 1933.

It is unquestioned that taxpayer purchased the securities in question for $134,464.01 and sold them in 1935 for $175,482.86 and that there was an apparent profit of $24,-515.79, which was 60% of $40,859.65, the difference stated in dollars between the purchase and sales price of the securities less a capital assets loss of $159.20. Plaintiff-appellant paid a tax of $7,134.17 on this returned taxable gain.

The taxpayer's claim to recover is based upon the claimed consequence of the legislative change in the statutory gold content of the dollar, which change occurred between the dates of purchase and sale of the

securities. The consequences relied upon by plaintiff are clearly indicated by his following propositions of law:

(1) The realized gain theory of income is based upon a comparison of cost in money with selling price in the same money or its equivalent and changes in the purchasing power of that money are disregarded.

(2) Where new money supersedes the cost money after a purchase is made by an investor and the use of the old money is prohibited, there is no way in which a taxable gain can be realized.

(3) The only basis provided for comparing purchase prices with selling prices in this case is the gold content of the old dollar and the gold content of the new dollar, and if that basis is used the appellant has not realized a taxable gain but has suffered a loss.

We find nothing in the decisions of the Supreme Court to support the plaintiff's proposition that the income consisting of gain from a sale of "capital assets" must be determined by a comparison of "cost in money with selling price in the same money or its equivalent," as distinguished from a comparison of cost in money with selling price in money. It is true, as stated by plaintiff, that the Supreme Court frequently has declared that gain in the money value of property is not income within the constitutional meaning of that term until some transaction has occurred which makes the gain, as such, available to the taxpayer and separable from the money cost. But we find no statements of the Court which go beyond the statutory method of determining "realized gain." The statutory definition of gain is the excess of the amount realized therefrom over the adjusted basis (of cost) and the loss is the excess of the adjusted basis over the amount realized; and the amount realized from the sale or other disposition of property "shall be the sum of any money received plus the fair market value of the property (other than money) received." [1]

We are of the opinion that judicial decisions and statutory enactments neither recognize, nor, by implication, attach any significance to the statutory gold content of the dollar as a factor in the determination of gain from the sale of capital assets. The standard unit of computation is the money dollar, an abstract or ideal unit of account. [2] This standard unit of money has not changed in money value throughout the existence of our monetary system. There have been changes from time to time in the form of the physical representatives of money, but lawful money in the United States has been the same since the Act of Congress of April 2, 1792, provided that "The money of account of the United States shall be expressed in dollars or units, dimes or tenths, cents or hundredths, and mills or thousandths, a dime being the tenth part of a dollar, a cent the hundredth part of a dollar, a mill the thousandth part of a dollar * * * *." [3]

The Legal Tender Cases, supra note 2, held that Congress had the power to make "paper money" legal tender for the discharge of money obligations which had been assumed prior to the issue of paper money. It was argued that the unit of money value must possess intrinsic value and that the paper dollar, unlike the gold coin dollar, possessed no intrinsic value. The Supreme Court answered the foregoing contention as follows: "The legal tender acts do not attempt to make paper a standard of value. We do not rest their validity upon the assertion that their emission is coinage, or any regulation of the value of money; nor do we assert that Congress may make anything which has no value money. What we do assert is, that Congress has power to enact that the government's promises to pay money shall be, for the time being, equivalent in value to the representative of value determined by the coinage acts, or to multiples thereof." 12 Wall. page 553, 20 L.Ed. 287.

It was pointed out in Norman v. B. & O. R. Co. [4] that the legal tender acts "left in circulation two kinds of money, both lawful and available, and contracts for payments in gold, one of these kinds, were not disturbed." Since there were in use after the

---

[1] U.S.C.A.Title 26, Sec. 111 (b).

[2] "* * * we will notice briefly an argument presented in support of the position that the unit of money value must possess intrinsic value. * * * The coinage acts fix its unit as a dollar; but the gold or silver thing we call a dollar is in no sense a standard of a dollar. It is a representative of it. * * *" Legal Tender Cases, 12 Wall. 457, 552, 553, 20 L.Ed. 287.

[3] C. 16, 1 Stat. 246, 250, Sec. 20, U.S. C.A. Title 31, Sec. 371.

[4] 294 U.S. 240, 55 S.Ct. 407, 415, 79 L.Ed. 885, 95 A.L.R. 1352.

passage of the legal tender acts two forms of money authorized by law, metallic and paper, and since both were made legal tender in payment of obligations, it follows that a contract to pay in gold was not affected by the legislative act which made paper money legal tender. But this resulted from the continuance by law of the two forms of money each of which was legal tender and each of which was circulating as lawful money of the United States, and not from any judicial recognition that paper money, dollar for dollar, was not equivalent in value to specie money.

In Deutsche Bank v. Humphrey [5] the plaintiff had deposited money payable on demand in a German bank in Germany. The money was not paid on demand and a suit was filed. As stated by the court "the debt was a debt of German marks"; and the question raised on appeal was whether the courts below were correct in holding that the marks should be translated into dollars at the rate of exchange existing when the demand was made. The Supreme Court stated that the liability of the bank was fixed at a certain number of marks both by the terms of the contract and by the German law, and the court assumed "that it was fixed in marks only, not at the extrinsic value that those marks then had in commodities or in the currency of another country." And the court added: "An obligation in terms of the currency of a country takes the risk of currency fluctuations and whether creditor or debtor profits by the change the law takes no account of it. * * * Obviously in fact a dollar or a mark may have different values at different times but to the law that establishes it it is always the same. If the debt had been due here and the value of dollars had dropped before suit was brought the plaintiff could recover no more dollars on that account. A foreign debtor should be no worse off."

Plaintiff seeks to avoid the force of the foregoing statement of the Supreme Court and insists that "the question of capital gain presents an entirely different question from that which is presented when parties enter into a contract which by its terms is to be settled in the currency of a particular country"; and plaintiff further states that in case of such a contract it is held by the courts that the parties have agreed to take their chances on the changes of the currency of the country, and, consequently, "it is held that marks are marks and francs are francs and dollars are dollars, no matter what changes may occur to affect their value or their purchasing power, or how such changes may be made."

But we see no way for plaintiff to avoid the adverse force of his own construction of the reasoning and holding in Deutsche Bank v. Humphrey, supra. All of plaintiff's transactions were made in reference to the currency of the United States and we cannot find any basis for plaintiff's claim to a greater protection against statutory changes in our laws relating to "money" than one has who is the owner of a note or bond and statutory changes have occurred between the dates of execution and maturity of the note or bond.

■ The recent decisions of the United States Supreme Court in Norman v. B. & O. R. Co., supra, Nortz v. United States [6] and Perry v. United States [7] have established conclusively that under our present monetary system there can be no legally recognized inequivalency of value between dollars of what plaintiff calls "cost money" and "selling price money." Plaintiff's proposition that "the realized gain theory" of income is based upon a comparison of cost in money with selling price in the same money or its equivalent" is in a sense true; but the proposition ignores the equivalency, dollar for dollar, of cost and selling price money. In Perry v. United States, supra, the plaintiff was the holder of an obligation of the United States for $10,000, known as "Fourth Liberty Loan 4½% Gold Bond." The bond provided "The principal and interest hereof are payable in United States gold coin of the present standard of value." It was the contention of the plaintiff that he was entitled to receive in payment of the bond "10,000 gold dollars each containing 25.8 grains of gold .9 fine" or its equivalent in gold by weight, either in the form of gold coin or uncoined gold, or, in the alternative, $16,931.25 in legal tender currency. The United States refused to redeem the bond except by payment of $10,000 in legal tender currency and the plaintiff sued to recover damages "in the sum of $16,931.25, the value of defendant's obligation." The

---

[5] 272 U.S. 517, 519, 47 S.Ct. 166, 71 L.Ed. 383.

[6] 294 U.S. 317, 55 S.Ct. 428, 79 L.Ed. 907, 95 A.L.R. 1346.

[7] 294 U.S. 330, 55 S.Ct. 432, 433, 79 L.Ed. 912, 95 A.L.R. 1335.

Supreme Court held that the joint resolution of June 5, 1933, "in so far as it attempted to override the obligation created by the bond in suit, went beyond the congressional power"; but the court further held that despite the breach of the obligation of the bond by the United States the facts alleged in plaintiff's petition did not show a cause of action for actual damages. The foregoing result was required, as pointed out by the court, because the recent monetary legislation had created a domestic economy in respect to gold, and a single monetary system with an established parity in all currency and coins, under which $10,000 in the form of currency would be equivalent in value to $10,000 of what plaintiff denominates "old money," whether gold coin money or currency money.

By reason of the fact that gold coins no longer circulate as a medium of exchange and since no private citizen can lawfully possess gold coins or gold bullion, and since, with a few immaterial exceptions, the only thing that one can do with gold or gold coin is to turn it in to the United States Treasury and receive in exchange an equivalent in currency, the equivalency being determined on the basis of the present statutory content of the dollar,[8] it must follow that in law the selling price in dollars of plaintiff's securities was equivalent to the same number of dollars in any one of the forms of what plaintiff calls "cost money."

The following hypothetical situation suggested by defendant illustrates the difficulty of plaintiff's position: If the taxpayer had borrowed the dollars ($134,464.01) necessary to buy the securities in question in 1933 and prior years and had not discharged his obligation until after he sold the securities in 1935 the taxpayer could have used $134,464.01 to discharge his obligation and would have had the excess of $41,018.85. And it is clear, as a matter of law, that his creditor who received the taxpayer's promise to pay at a time prior to the changing of the gold content of the dollar would have been required to accept in discharge of the obligation $134,464.01 of the so-called "new money," although the obligation represented what plaintiff calls "cost money."

The judgment of the District Court is affirmed.

---

[8] See discussion in Norman v. B. & O. R. Co.; Nortz v. U. S., supra, and Perry v. U. S., supra.