## KVP SUTHERLAND PAPER COMPANY
v.
### The UNITED STATES.
### No. 303-60.

United States Court of Claims.
April 16, 1965.

Walter J. Cummings, Jr., Chicago, Ill., for plaintiff. Harlowe E. Bowes, Robert R. Frei and Sidley, Austin, Burgess & Smith, Chicago, Ill., of counsel.

S. Laurence Shaiman, Washington, D. C., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for defendant. C. Moxley Featherston, Lyle M. Turner, and Philip R. Miller, Washington, D. C., were on the brief.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

COWEN, Chief Judge.

Plaintiff, successor to the Kalamazoo Vegetable Parchment Company, is engaged in the production and sale of paper, with its principal offices and plant located in Kalamazoo, Michigan.

In 1943, plaintiff purchased a long-idle pulp and paper mill in Espanola, Ontario, Canada, for 1,000,000 Canadian dollars. In order to place the facilities (which included a townsite adjoining the mill property, a dam and hydroelectric plant serving the mill and the town, and certain timber rights) in a state whereby full self-sustaining production could be achieved, plaintiff spent over 8,000,000 dollars in Canadian funds on the physical plant and inventories of pulpwood and supplies. Some 321,334.55 Canadian dollars worth of machinery, equipment and supplies, costing plaintiff $292,106.50 in United States currency, was purchased in the United States, shipped to Espanola and charged to the project. For the rest of the Canadian currency expenditures made on behalf of Espanola, plaintiff purchased Canadian dollars on the United States market.

In 1946, when the Espanola mill was ready to begin production, a Canadian subsidiary called the KVP Company Limited was incorporated under the laws of Canada, pursuant to a plan approved by the Canadian authorities. All of the Espanola properties were then transferred to the subsidiary for a consideration equal to the cost of the properties in Canadian funds. Plaintiff received notes of KVP Limited in the aggregate principal amount of 9,333,599.44 Canadi-

an dollars and 450,000 shares of no-par capital stock of KVP Limited having a stated value of one Canadian dollar per share. The notes were made payable in Canadian dollars only because the Canadian Foreign Exchange Control Board would not permit payment in United States currency.

Plaintiff secured a ruling from the Commissioner of Internal Revenue to the effect that the transfer of assets to KVP Limited was not a transfer having as one of its principal purposes the avoidance of federal income taxes within the meaning of Section 112(i) of the Internal Revenue Code of 1939. Plaintiff reported no gain or loss with respect to the transfer in its 1946 income tax return.

The cost to plaintiff for the 9,333,-599.44 Canadian dollars was only $8,455,-113.81 in United States currency, due to the fact that the Canadian dollar was selling at an average of 91 cents in United States currency during the time plaintiff made its purchases.

The notes were payable serially on the last day of each calendar quarter beginning March 31, 1947. Through a series of transactions the maturity dates were extended, and some 6,000,000 more Canadian dollars were loaned to KVP Limited, which issued notes therefor payable in Canadian dollars to plaintiff.

In order to finance the transaction, plaintiff borrowed $9,000,000 from the Chase National Bank of the City of New York, issuing its promissory notes to Chase in return. To secure the loan and a subsequent one obtained from the Chase National Bank, all securities issued by KVP Limited to plaintiff were deposited with the bank.

To provide Canadian distribution for pulp and paper products produced by KVP Limited, plaintiff also purchased in 1945 all of the outstanding capital stock of Appleford Paper Products Limited, which was engaged in the business of converting paper. Plaintiff then loaned Appleford $900,000 to provide for plant expansion and working capital, and Appleford issued a series of notes payable to plaintiff in Canadian dollars in installments commencing December 31, 1953.

The repayment by its subsidiaries of the principal due on the notes was made to plaintiff in two ways. Part of the indebtedness was repaid in Canadian dollars, by check, to plaintiff. It immediately converted these Canadian dollars into United States dollars. The remainder was repaid by means of intercompany credits affected by offsetting the Canadian dollars due to plaintiff against amounts due by it to KVP Limited for pulp purchases made by plaintiff from KVP Limited. Plaintiff's open-account indebtedness for pulp purchases was credited by an amount equal to the value of the Canadian dollar indebtedness in United States currency at the then prevailing exchange rate. This procedure was followed in order to avoid the conversion fees which would have otherwise been payable on the conversion of the foreign currency into domestic currency. For the purposes of the decision in this case, we have treated these intercompany credits as if they were actually repayments to plaintiff in Canadian dollars which it then converted into United States currency. See Seaboard Finance Co. v. Commissioner, 225 F.2d 808 (9th Cir. 1955). The notes were redeemed in installments in the years of 1949, 1951, 1952, 1953, 1954, 1955, and 1956, inclusive.

While the debts were reflected in the records of the subsidiaries, they did not maintain transfer books with respect to the notes. No transfer agent was appointed by the subsidiaries, and no agreement of any kind between the subsidiaries, and plaintiff required notification of the issuer of the notes in order to make a transfer of the notes effective. None of the notes had interest coupons attached.

The interval between the dates of repayment of the notes in Canadian dollars and the conversion thereof into United States currency was less than 6 months in each instance. As a result of the repayments and the conversion of the Canadian dollars, plaintiff realized a gain of

more than $700,000 in excess of its cost of the Canadian dollars repaid. The gain was entirely due to the fact that when the Canadian dollars were repaid and converted, the Canadian dollar was more valuable in terms of the United States dollar than it had been on the various dates when plaintiff purchased such Canadian dollars it loaned to its subsidiaries. In its federal income tax returns for the taxable periods involved, plaintiff reported the gain realized as long-term capital gain.

Upon audit of the returns, the Commissioner of Internal Revenue determined that the gains reported were taxable as ordinary income and disallowed plaintiff's computation of its tax at the lower capital gains rates. A deficiency assessment was made for the additional amounts of income tax, excess profits tax and interest due pursuant to the Commissioner's determination. Plaintiff paid the deficiency, amounting to $256,530.40 and, after it had filed timely claims for refund, brought this suit to recover the amount paid, plus statutory interest.

It is agreed that each of the notes was held for more than 6 months between the dates of its issuance and redemption.

Two issues are presented for our decision: (1) whether the gain realized by plaintiff during the taxable years in suit constituted long-term capital gain, short-term capital gain, or ordinary income, and (2) whether plaintiff's gain was realized upon its receipt of the payments in Canadian currency in discharge of the notes or at the time the Canadian currency was converted into United States dollars.

The first five taxable periods involved here are covered by the provisions of the Internal Revenue Code of 1939, while the 1954 Code is applicable to the last 2 years. For the purposes of this action, there is no material difference between the pertinent sections of the two Codes. The statutory provisions of each Code sets forth a three-fold test for the determination of whether gain realized by the taxpayers is to be classified as a long-term capital gain. The gain must be realized from a "sale or exchange" of property. The property sold or exchanged must be a "capital asset" in the hands of the seller, and the property sold or exchanged must have been held for more than 6 months prior to the transfer.

We shall first discuss defendant's contention that the gains realized by plaintiff in the transactions before us were ordinary income in that plaintiff's loans to its subsidiaries were made in the normal course of its business. Defendant concedes that foreign currency is property and, as such, is not specifically excluded from treatment as a capital asset by Section 117(a) of the 1939 Code and Section 1221 of the 1954 Code.[1] However, defendant maintains that the transactions in which plaintiff engaged fall within the rationale of Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955) and

---

1.  Section 1221 of the 1954 Code (26 U.S.C. 1958 Ed. § 1221) defines a capital asset as follows:
    "For purposes of this subtitle, the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—
    "(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

"(2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business.
\* \* \* \* \*
"(4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1)."
Subsection 117(a) (1) of the 1939 Code (26 U.S.C. 1952 Ed. § 17(a)) defines a capital asset in the same terms, except that it does not contain any counterpart to paragraph (4) of Section 1221 of the 1954 Code.

Booth Newspapers, Inc. v. United States, 303 F.2d 916, 157 Ct.Cl. 886 (1962). We do not agree with this contention because of the significant factual distinctions between those cases and the action before us. In Corn Products, the taxpayer, who consumed millions of bushels of corn annually in its manufacturing processes, dealt in corn futures as an integrated and functional part of its business to hedge against price rises in raw material inventories and to insure against scarcity. In Booth Newspapers, taxpayers were users of newsprint who bought a newsprint manufacturing facility at a time when there was an extreme shortage as a hedge against commercial sources and as a principal supplier in times of need. The court treated the purchase of the paper plant as an acquisition of a vital course of inventory. Plaintiff here was not a dealer in Canadian currency. It says, and we agree, that plaintiff had a substantial investment in the stocks of the subsidiaries and that the loans were made to provide the capital needed in the conduct of their businesses, thereby enhancing plaintiff's investment in the stocks of the two companies. The notes which plaintiff received as a creditor were capital assets, Paine v. Commissioner, 236 F.2d 398 (8th Cir. 1956) and Conrad N. Hilton, 13 T.C. 623 (1949).

In its view of the dealings with its subsidiaries, plaintiff claims that its holding period for the Canadian currency commenced when plaintiff purchased such currency it loaned to the subsidiaries and, in the case of property transferred to KVP Limited, when plaintiff agreed to accept Limited's purchase price notes, payable in Canadian currency. Plaintiff further claims that its holding period ended in each instance when the Canadian money plaintiff received in discharge of the notes was converted into United States dollars. The interval in each instance was more than 6 months. We cannot accept this characterization of the facts as a basis for a decision in this case. First, it collides with the undisputed fact that plaintiff disposed of the Canadian currency it had purchased by loaning it to the subsidiaries and receiving their notes in exchange therefor. Second, plaintiff's treatment of the situation ignores the fact that the transactions in this case involve three taxable events, each of which must be examined separately to determine its taxable consequences.

Plaintiff's investment in the Canadian dollars was short-lived. Plaintiff's acceptance of the notes in exchange for the Canadian dollars transferred full title to such currency to the subsidiaries. Plaintiff retained none of the elements of ownership. It is interesting to note that in its brief plaintiff argues that the notes were capital assets in its hands and cites cases in support of that statement. Such a recognition is, of course, inconsistent with plaintiff's general contention that it held the Canadian currency it acquired for the subsidiaries for periods in excess of 6 months. If the dollar value of the Canadian currency purchased by plaintiff had increased between the dates of purchase and the dates it was transferred to the subsidiaries, plaintiff would have realized a gain as a result of the disposition. No gain or loss was reported and the question is now moot.

Plaintiff's basis for the Canadian money loaned was the cost in United States dollars at the exchange rate prevailing at the time of purchase. At maturity, when the subsidiaries paid the notes in Canadian currency, another taxable event occurred. At that time plaintiff acquired property which had a value in excess of the cost basis of the notes and it then realized a gain measured in terms of the difference between the dollar cost of the Canadian currency and its value in dollars when the notes were paid. Section 111 of the 1939 Code (26 U.S.C. 1952 Ed., § 111) and Section 1001 of the 1954 Code (26 U.S.C. 1958 Ed., § 1001) provide that the gain from any disposition of property is the excess of the amount realized therefrom over its adjusted basis. The amount realized is the amount of money received, plus the fair market value of property received.

When an obligation is discharged by a payment in property, the gain to the recipient is measured by the difference between the fair value of the property and the basis of the obligation. Bingham v. Commissioner, 105 F.2d 971 (2d Cir. 1939); Felin v. Kyle, 102 F.2d 349 (3d Cir. 1939).

Although it is hard put to find any provision in the Internal Revenue Codes in support of its argument, plaintiff asserts that no gain in fact was realized when the notes were paid because it had not converted the Canadian dollars into United States currency; that its investment in the Canadian dollars was still subject to fluctuations on the market; and that in transactions involving foreign currency, no taxable event occurs until the transaction is closed by conversion of the foreign money.

Plaintiff relies principally on B. F. Goodrich Company, 1 T.C. 1098 (1943) and Foundation Company, 14 T.C. 1333 (1950). In Goodrich the taxpayer borrowed 11,000,000 francs from a French bank and loaned the francs to its French subsidiary. In 1936, after the franc had declined in value, the taxpayer purchased francs at a lower price and repaid the bank loan before its subsidiary paid its notes. The court held that the taxpayer realized no income on the discharge of the debt to the bank because the entire transaction, including that with the bank and the loan to the subsidiary, had not been closed. With respect to the loan by the bank and its repayment, the court stated "No real gain or loss could result from the mere borrowing and return of fungible property."

In Foundation Company, the taxpayer had, prior to 1928 and in the regular course of its business, performed construction work for a country club in Peru. The debt, which was payable in Peruvian soles, was accrued on the taxpayer's books at its value in United States dollars and reported as gross receipts in its federal income tax return for 1928. In the period 1937 to 1941, after the dollar value of the Peruvian sole had declined, the debt was paid and the taxpayer immediately converted the soles into dollars. The court held that the taxpayer sustained an ordinary loss in the amount of the difference between the accrued value of the soles and their value at the time of receipt and conversion. The court did not decide whether the losses occurred when the soles were received or when they were converted into dollars, but it did state that "the exchange of each group of soles for United States dollars marked a clearly identifiable event and constituted a closed transaction with respect to those soles".

As defendant has correctly pointed out in its brief, the facts in Goodrich and Foundation Company are so dissimilar to those before us that the cases have little bearing on the issues in this case. To the extent, however, that the quoted statements from the two cases may be construed as holding that the payment of a loan in foreign currency is not an event which gives rise to a taxable gain or loss without the necessity of converting the foreign currency into United States dollars, we decline to follow them. Although it recognizes foreign currency as property, the Tax Court treats it, without explanation, quite differently from other commodities which can be used in payment of an obligation, such as gold, wheat, or diamonds. We see no basis for this exception, and the court gives none. We think the question involved in such a situation was correctly decided in Waterman's Estate v. Commissioner, 195 F.2d 244 (2d Cir. 1952). There, an estate claimed an ordinary loss as the result of the receipt of payment of a bill of exchange for 10,000 English pounds. The bill of exchange had been valued for estate tax purposes at a sum which, at the current rate of exchange, was more than $16,000 less than the value of the obligation in dollars at the time of the decedent's death. The pounds received were not converted into dollars because they were contained in a blocked sterling account throughout the year in which the payment was made. Despite that fact, the Second Circuit held that "the taxpayer sustained a loss when the

note was so paid and that fixed the time as of which the loss was allowable".

Since we have decided that the notes, which plaintiff held for more than 6 months, were capital assets, the only question remaining is whether plaintiff's receipt of the Canadian currency in payment of the notes was a "sale or exchange" within the meaning of Section 117(a) of the Internal Revenue Code of 1939 and Section 1222 of the 1954 Code. This decision turns on the provisions of Section 117(f) of the 1939 Code and Section 1232 of the 1954 Code.[2]

The receipt of payment on ordinary notes or debts (other than securities with interest coupons or notes in registered form) is not a sale or exchange which is accorded treatment as a capital gain or loss. Fairbanks v. United States, 306 U.S. 436, 59 S.Ct. 607, 83 L.Ed. 855 (1939); Felin v. Kyle, supra. The application of this general rule is not altered by the fact that the notes, paid in the currency received by plaintiff, were themselves received in exchange for property. Osenbach v. Commissioner, 198 F.2d 235 (4th Cir. 1952) and Bingham v. Commissioner, supra.

The sections of the Codes last cited are a congressional abrogation of the general rule and are to be narrowly applied. Corn Products Refining Co., supra. The note or other indebtedness must show on its face that it is registered. Victor A. Miller, 32 T.C. 954 (1959).

It is undisputed that the notes involved here were not in registered form on or prior to March 1, 1954, and were issued prior to January 1, 1955. However, in an effort to avoid the plain statutory requirement, plaintiff contends that the purpose of the limitation was simply to prevent original issue discount in the nature of interest from receiving capital gain treatment. Plaintiff points to Senate Report No. 1622, 83rd Cong., 2d Sess. 112, U.S.Code Cong. and Adm.News, 1954, p. 4629, and argues that the validity of its position is demonstrated by the fact that Section 1232 of the 1954 Code treats all promissory notes alike on retirement and provides new rules to insure that gain attributable to original issue discount is taxed as ordinary income. The report cited indicates quite clearly that the problem of original discount arose after enactment of the 1939 Code and that new provisions were inserted in Section 1232 of the 1954 Code to eliminate questions which had arisen under the 1939 Code as to whether the increment received on a registered bond or note issued at a discount should be treated as a capital gain or as interest income. But the question discussed is unrelated to the changes in the 1954 Code which treat unregistered notes issued after January 1, 1955, in the same manner as registered notes. The Committee Report simply gives no clue as to why the change was made. In the absence of clear and unmistakable evidence of a congressional intention to the contrary, the statutory

2. 26 U.S.C.1952 Ed. § 117(f) provides:
    "(f) Retirement of bonds, etc.
    "For the purposes of this chapter, amounts received by the holder upon the retirement of bonds, debentures, notes, or certificates or other evidences of indebtedness issued by any corporation (including those issued by a government or political subdivision thereof), with interest coupons or in registered form, shall be considered as amounts received in exchange therefor."
    26 U.S.C. 1958 Ed., § 1232 provides:
    "(a) General rule.
    "For purposes of this subtitle, in the case of bonds, debentures, notes, or certificates or other evidences of in-

debtedness, which are capital assets in the hands of the taxpayer, and which are issued by any corporation, or goverment or political subdivision thereof—
    "(1) Retirement.
    "Amounts received by the holder on retirement of such bonds or other evidences of indebtedness shall be considered as amounts received in exchange therefor (except that in the case of bonds or other evidences of indebtedness issued before January 1, 1955, this paragraph shall apply only to those issued with interest coupons or in registered form, or to those in such form on March 1, 1954)."

language must be read in its common and natural meaning.

Our holding on this point is supported by the Tax Court decision in Columbia Sand and Gravel Company, Inc., 11 CCH Tax Ct. Mem. 794 (1952), in which the court held that losses on bonds which were within the limitations of section 117(f), were capital:

"Since the purchase and redemption of the bonds was a capital matter, section 117, Internal Revenue Code, petitioner's entire loss was a capital loss, * * *".

See also the discussion of this section in Bailey, Creditors' Losses on Foreign Currency Loans, 31 Taxes 476, 479 (June 1953), wherein Mr. Bailey states:

"In its simplest form the problem may be illustrated by reference to a case where an American corporate taxpayer, for sound business reasons, loans 1,000 imaginary pesos worth 1,000 United States dollars to a foreign affiliate. The loan may be evidenced by a promissory note, by a bond, or merely by a book entry. As part of the loan transaction, the American taxpayer purchases pesos and transmits those pesos to the borrower. At a later date, and after a decline of 50 per cent in the value of the peso, the borrower returns 1,000 pesos to the lender. Thereafter the lender converts the 1,000 pesos into 500 United States dollars.

\* \* \* \* \* \*

"If the [foreign currency] loan is evidenced by a corporate obligation bearing interest coupons or in registered form, the loss should be deemed a capital loss deductible to the extent that it may be offset against capital gains. On the other hand, if the obligation is evidenced only by a book entry or an ordinary promissory note, no sale or exchange is presumed from the fact of repayment and the loss is an ordinary one deductible under Section 23(f) of the [1939] Code.

Accordingly, we hold that the repayment of the notes held by plaintiff for over 6 months was not a sale or exchange and that the gain plaintiff realized upon repayment of the notes is taxable as ordinary income.

Since the Canadian currency received by plaintiff in discharge of the notes was not held for 6 months but immediately converted into United States dollars, any gain which plaintiff realized in this separate transaction was a short-term gain.

For the reasons stated plaintiff's petition is dismissed.