John A. GILLIN

v.

The UNITED STATES.

No. 24–69.

United States Court of Claims.

March 20, 1970.

Vester T. Hughes, Jr., Washington, D. C., attorney of record, for plaintiff; William D. Jordan and Jackson, Walker, Winstead, Cantwell & Miller, Dallas, Tex., of counsel.

Michael H. Singer, Washington, D. C., with whom was Asst. Atty. Gen., Johnnie M. Walters, for defendant; Philip R. Miller and Joseph Kovner, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

ON DEFENDANT'S AND PLAINTIFF'S MOTIONS FOR PARTIAL JUDGMENT ON THE PLEADINGS

DAVIS, Judge.

Plaintiff John A. Gillin, an individual taxpayer resident in Texas, has filed a petition seeking, in one of several claims, a refund for taxes assessed and paid for 1961 on gain derived from the conversion and reconversion of funds necessary to pay a debt incurred in Canadian dollars. The paragraph of the petition setting forth this demand (Paragraph VII) gives us only the following facts, all of which are admitted by the Government's

answer: On five occasions from September 1957 to November 1960 plaintiff borrowed specified amounts of Canadian dollars—

|  | (Canadian) |
|---|---|
| September 13, 1957 | $110,000.00 |
| October 17, 1957 | 18,268.91 |
| April 7, 1958 | 75,000.00 |
| June 3, 1958 | 50,000.00 |
| November 3, 1960 | 7,000.00 |
| Total | $260,268.91 |

For these sums plaintiff gave standard form promissory notes, bearing standard rates of interest, and providing for repayment in Canadian dollars. The amounts borrowed were immediately converted into United States dollars and used for various personal and investment expenses. On November 30, 1961, taxpayer purchased $260,268.91 Canadian dollars for $19,510.76 United States dollars less than he had received in the previous Canadian-to-United States exchanges, and immediately repaid his loans. He reported this difference of $19,510.76 to the Internal Revenue Service as long term capital gain. The Service has treated it as ordinary income or short term capital gain (the tax consequences of either view being the same in this case).

On these facts, both parties have moved for partial judgment on the pleadings with respect to this claim.[1] Plaintiff asks, first, for full refund of the tax paid, on the ground that no taxable gain at all was realized through the transaction. His secondary position is that, in any event, the $19,510.76 must be considered as no more than long term capital gain. The defendant supports the Service's position.

The Internal Revenue Code and the Treasury Regulations do not, except in very minor ways, focus directly on the difficulties of the tax treatment of income arising from changes in value of foreign currency. Nor have the courts and commentators yet agreed upon a coherent set of rules for the various faces of the problem.[2] It is important, therefore, to delineate precisely what is involved in our case, so that we can restrict our discussion to the specific facts and the relatively narrow area they encircle.

On the facts we are given, there is no suggestion that taxpayer carried on any business or had other transactions in Canada, either in connection with the money he borrowed or otherwise, or even that he had other Canadian funds. He was not a Canadian resident. The Canadian sums he received were not used to buy anything (goods, services, or securities) in that country, nor were they invested or banked there. Instead, the borrowed money was immediately converted into United States funds and used in this country—for personal expenses and investment, and not in the carrying on of a trade or business. On the day the Canadian loans were repaid (November 30, 1961), United States funds were converted and the loans discharged at once. There is, in short, no underlying transaction to concern us, nor any course of dealings, nor a taxpayer with other substantial economic connections with the foreign country. We have, instead, a pure borrowing of Canadian money, unrelated to any ongoing business, with the borrower intending to change the foreign funds immediately into our dollars for non-business use in the United States, and of

---

1. None of the other refund claims in the petition is now before us.

2. See, e. g., Ravenscroft, Taxation of Income Arising From Changes in Value of Foreign Currency, 82 Harv.L.Rev. 772 (1969); Comment, Income Tax Consequences of Foreign Currency Fluctuations, 37 Tul.L.Rev. 282 (1963); Comment, The Separate Tax Treatment of Import Transactions and Related Foreign Exchange Fluctuations: The Case for Integration, 68 Yale L.J. 497 (1959); Note, Income Tax Consequences of Fluctuations in Foreign Exchange, 1955 Univ. of Ill. Forum 595; Roberts, Borrowings in Foreign Currencies, 26 Taxes 1033 (1948).

later re-converting the United States dollars into Canadian units immediately before repayment. We are not told whether taxpayer hoped to gain through fluctuation of the exchange rate, but it is fully consistent with what we know that that could well have been true.[3]

There is no doubt, and taxpayer admits, that he received a distinct and measurable *economic* gain when he converted his United States dollars into Canadian money, in 1961, for some $19,000 less than he had obtained on the reverse exchanges in 1957, 1958, and 1960. He was that much better off than before; he "realized within the year an accession to income, if we take words in their plain popular meaning * *". United States v. Kirby Lumber Co., 284 U.S. 1, 3, 52 S.Ct. 4, 76 L.Ed. 131 (1931). It is also clear that this gain (if it was taxable) was realized in 1961, on the reconversion and repayment, and the transaction was closed at that time. *See* KVP Sutherland Paper Co. v. United States, 344 F.2d 377, 170 Ct.Cl. 215 (1965). The Revenue Code treats as gross income "all income from whatever source derived" (§ 61(a); *see* Commissioner of Internal Revenue v. Glenshaw Glass Co., 348 U.S. 426, 75 S.Ct. 473, 99 L.Ed. 483 (1955)), but plaintiff insists that nevertheless *taxable* gain did not accrue. His position is that he paid back exactly what he had borrowed—$260,268.91 Canadian—and that a taxpayer need recognize no gain upon the borrowing and later repayment of the same property.

We have already rejected the simplistic application of that principle to the foreign currency field. KVP Sutherland Paper Co. v. United States, *supra,* 344 F.2d 377, 381, 170 Ct.Cl. 215, 223 (1965). When transactions are domestic, changes in the value of the United States dollar do not, in themselves, create taxable income because the postulate of the American tax system is that the value of the

dollar is constant. "An obligation in terms of the currency of a country takes the risk of currency fluctuations and whether creditor or debtor profits by the change the law takes no account of it. Legal Tender Cases, 12 Wall. 457, 548, 549, 20 L.Ed. 287. Obviously in fact a dollar or a mark may have different values at different times but to the law that establishes it, it is always the same." Die Deutsche Bank Filiale Nurnberg v. Humphrey, 272 U.S. 517, 519, 47 S.Ct. 166, 167, 71 L.Ed. 383 (1926). *See, also,* Bates v. United States, 108 F.2d 407 (C.A.7, 1939), cert. denied, 309 U.S. 666, 60 S.Ct. 591, 84 L.Ed. 1013 (1940); A. Nussbaum, Money in the Law—National and International (rev. ed. 1950), pp. 172–175. For our legal system, however, foreign currency, which is not established by United States law, has a different status. Account is taken, much more often (if not always), of its fluctuations in value, and it is frequently treated, not as the medium of exchange, but as property or a commodity. This is especially likely to be so when it is converted into United States funds.

Thus, when Mr. Gillin borrowed Canadian money and converted it at once into domestic dollars, and later reversed the process, paying off his debt in Canadian funds, it was not at all the same as if he had borrowed United States dollars and used them in this country. Neither was it the same as if he had borrowed Canadian money, used it in that country, and then repaid his debt with Canadian funds. Nor was it as if he had simply borrowed a commodity or security which he kept and later returned at a time when its value had happened to shift. The fact is that he deliberately converted the Canadian money as soon as he could into United States dollars—the former were borrowed precisely in order to obtain the latter—and thereafter reconverted so as to be

---

3. The notion that plaintiff obtained better loan terms in Canada, and had no interest in exchange fluctuation, seems improbable in view of the allegations in the petition that the "notes were standard form promissory notes bearing standard rates of interest."

able to pay off his debt at a profit to himself. Whatever his primary motivation, it seems clear that he took advantage of the loans so as to realize gain on the exchanges of the one currency for the other.[4]

In this situation there is no reason why taxpayer should be free of tax on the gain. By the arrangements he made, he "necessarily involved [himself] in a speculation in foreign exchange" and "as things turned out, [he] gained by the speculation * * *." Willard Helburn, Inc. v. Commissioner of Internal Revenue, 214 F.2d 815, 818 (C.A.1, 1954). The profit was as much a "windfall item" as the comparable exchange profit in Willard Helburn, Inc., supra. See, also, Bennett's Travel Bureau, Inc. v. Commissioner, 29 T.C. 350, 355 (1957). It falls well within the generous sweep of § 61(a) ("all income from whatever source derived").

Plaintiff relies, understandably, on B. F. Goodrich Co. v. Comm'r, 1 T.C. 1098 (1943), and Coverdale v. Comm'r, 4 T.C.M. (CCH) 713 (1945). In Goodrich, a domestic corporation borrowed 11,000,-000 French francs, valued at $651,000 U. S. dollars, and lent them to its French subsidiary. Later, that taxpayer purchased 11,000,000 francs for $514,000 U. S. dollars and repaid its loan. The Tax Court held that no taxable gain accrued to the taxpayer, and said, among other things, that "[a] mere borrowing and returning of property does not result in taxable gain." 1 T.C. at 1103. As already indicated, this court has rejected that broad generalization for foreign currency purposes. KVP Sutherland Paper Co. v. United States, supra, 344 F.2d at 381, 170 Ct.Cl. at 223.[5] Moreover, the Goodrich decision, in contrast to this dictum, is irrelevant to our case; the actual holding was that the transaction was still open since the subsidiary owed the 11,000,000 francs and neither gain nor loss could be recognized until after that debt was discharged. Coverdale is pretty much in point on the ground on which the court chose to go,[6] but we decline to follow it.

■ Having decided the initial question of taxable gain in favor of the Government, we turn now to the more difficult task of determining the nature of that gain. There are three alternatives: (1) long term capital gain; (2) ordinary income from the discharge of indebtedness for less than the amount owed; and (3) taxability as a short sale under or by analogy to 26 U.S.C. § 1233. Taxpayer urges the first, while defendant, preferring the third, acknowledges that both of the latter two lead to the same result in this case.

■■ Plaintiff, citing KVP Sutherland Paper Co., supra, points out that the exchange of foreign into domestic currency can constitute a "sale or exchange" of a capital asset. The major problem is, however, in finding an asset which was held for more than six months and then sold or exchanged. Obviously, the Canadian currency was held for less

---

4. In Cleary v. United States, 232 F.Supp. 828, 831 (W.D.Pa.1964), involving the borrowing of shares (which were sold) and the return of other shares of the same stock (then valued at a higher figure), there was a finding that the sale of the borrowed shares was involuntary and not undertaken "as an intentional disposition of his stock in the market for purposes of gain or loss as a market speculation".

5. It may even be that the Goodrich court would not have applied the generality of its statement to the facts now before us, involving a conversion of the borrowed foreign funds followed by a later reconversion. The court expressly noted that the "petitioner did not buy 11,000,000 French francs for $514,162.50 and then sell them for $651,132.73. Neither did it exchange them for property having a value of the latter amount." 1 T.C. at 1104.

6. The court appears to put its holding on the basis that that taxpayer, who borrowed Canadian money, also paid back Canadian money, but the opinion announces, too, that, in any event, there could be no gain via the currency fluctuation since there was a loss on the underlying transaction for which Coverdale borrowed the Canadian money.

than one day before it was converted in each instance.[7] The United States money received on conversion cannot be considered a capital asset held for more than six months; it was not in fact so held but was used for personal expenses and investment; more fundamentally, the same reasons which preclude recognition of changes in value of the United States dollar bar acceptance of domestic money as a capital asset which can be held for appreciation (or depreciation) in value. Cf. Bates v. United States, *supra*, 108 F.2d 407 (C.A.7, 1939).[8] Plaintiff argues that the capital asset held for more than six months was the debt obligation itself. But retiring one's own debt does not result in a sale-or-exchange or in capital gain (except where Congress so provides specifically). See 26 U.S.S. § 61(a) (12) (1964); Fairbanks v. United States, 306 U.S. 436, 59 S.Ct. 607, 83 L.Ed. 855 (1939); KVP Sutherland Paper Co. v. United States, *supra*, 344 F.2d at 382, 170 Ct. Cl. at 224; Felin v. Kyle, 102 F.2d 349 (C.A.3, 1939). It is not possible, therefore, to find on any theory a long term capital transaction in plaintiff's dealings.

Of the other two analyses, the concept of income-from-debt-discharge seems to us to suit this particular case quite neatly.[9] Section 61(a) (12) of the 1954 Code declares:

Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

\* \* \* \* \* \*

(12) Income from discharge of indebtedness.

As we have pointed out, the proximity of the conversions to the loan and repayment makes clear that plaintiff's intent in borrowing the Canadian dollars was to acquire United States money at once, and that currency, in turn, was to be used later to buy back Canadian funds to repay the debt, if possible at an exchange profit. In effect, the taxpayer borrowed United States funds, and the source of his gain was a decline in the value of the debt in terms of American dollars, enabling him to retire it for less United States currency than he received in incurring it. In this light, the transaction is analogous to the issuance of a bond and its repurchase by the obligor for less than face value, which has been held to be ordinary income (United States v. Kirby Lumber Co., *supra*, 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131 (1931); Helvering v. American Chicle Co., 291 U.S. 426, 54 S.Ct. 460, 78 L.Ed. 891 (1934)). While it is true that the loan was acquired and repaid with the same number of Canadian dollars, the entire transaction was designed and executed so as to secure United States money for plaintiff and also to put him in a position to repay the debt with less American dollars than he had earlier obtained. United States funds were placed in his possession almost simultaneously with the incurrence of the debt. At the other end of the operation, United States cur-

---

7. If Mr. Gillin borrowed Canadian money, held it for more than six months, then exchanged it for American currency, and later reconverted to Canadian funds which were used to repay the debt, there might be different taxable consequences. *Cf.* KVP Sutherland Paper Co. v. United States, *supra*, 344 F.2d at 383, 170 Ct.Cl. at 226.

8. There may possibly be some inconsistency in policy in permitting a speculator long term capital gains treatment for buying foreign currency and holding it six months, while denying such treatment if

he purchases domestic currency with foreign funds, holding the United States money for the requisite period of time before reconverting. But, if so, the gap is inherent in the Code as it now stands, and must await any necessary correction by Congress or, perhaps, the Treasury.

9. We do not reject the Government's contention that foreign currency may be the subject of a short sale transaction, but neither do we consider it since we find it easier, in this instance, to place our decision on the other basis which entails the same disposition.

rency was used to get the Canadian money necessary for immediate payment of the loan at a time when the exchange rate was favorable. The conversions were not independent of, or separate from, the debt but were integral to the arrangement and formed a necessary part of it. Viewed as a whole, in the perspective of the realities of this particular transaction, there was an assumption and repayment of a debt for less than face value, resulting in ordinary gain under 26 U.S.C. 61(a) (12) (1964). See Kentucky & Indiana Terminal R.R. v. United States, 330 F.2d 520 (C.A.6, 1964).

Defendant's motion for partial judgment on the pleadings is granted and plaintiff's cross-motion for partial judgment on the pleadings is denied. Paragraph VII of the petition is dismissed.

SKELTON, Judge (concurring):

I concur with the result reached by the majority, but do not agree with the reasoning and route followed in reaching it.

The majority has concluded that the gain to the taxpayer is ordinary gain resulting from income from the discharge of indebtedness for less than face value. I think that a more realistic approach and one that is more in keeping with the facts is to regard the gain as a short-term capital gain resulting from a transaction in foreign currency. The result taxwise will be the same to the taxpayer, but in my opinion, our decision would be on sounder ground and more in accord with the events which transpired in the case if we held that the taxpayer received a short-term capital gain which must be included in his ordinary income.

I find no support in the record for the several statements of the majority to the effect that the taxpayer designed and executed the entire transaction with the deliberate purpose and intent of acquiring Canadian dollars so he could convert them into United States dollars, and, in turn, reconvert these dollars into Canadian dollars and repay his debt

with less American dollars than he had earlier obtained, thus realizing a profit for himself. This appears to be an unwarranted assumption or an inference from the facts by the majority, because the plaintiff never made such an admission and the government never at any stage of the proceeding advanced such a theory or contention. It is true the transaction did in fact result in such a profit for the plaintiff, but there is no evidence that he planned it that way. In fact, he could have sustained a loss if the value of the Canadian dollar had increased in comparison with the American dollar.

There is even less support for the following statement in the majority opinion:

* * * In effect, the taxpayer borrowed United States funds, and the source of his gain was a decline in the value of the debt in terms of American dollars, enabling him to retire it for less United States currency than he received in incurring it. * *

This statement assumes events "in effect" which did not occur and ignores those which did take place. The taxpayer did not borrow United States funds either actually or "in effect." He borrowed Canadian dollars five different times over a three year period and each time gave his note for their repayment. The funds of the United States were not involved in any way at the times he borrowed the Canadian money. The fact that the taxpayer sold the Canadian dollars for United States funds after the borrowings had been made did not in any way result in a borrowing of United States funds. The conversions were separate transactions and had nothing to do with the creation of the debts.

I cannot agree with the majority that "[T]here was an assumption and repayment of a debt for less than face value, resulting in ordinary gain * * *." The taxpayer borrowed a fixed amount of Canadian dollars and gave his notes for the same amount of the same money and finally repaid the notes with the exact specified amount of Canadian dollars.

The notes were never discounted nor reduced in any way. They were not paid with an amount less than their face value, but the identical amount of the debt was paid. I do not think we are justified in holding otherwise. In fact, the main thrust of the taxpayer's argument that he did not owe any tax at all was the fact that he repaid the exact amount of the debt in kind as required by the notes.

On first impression, it appeared that the taxpayer was entitled to treat his profit as long-term capital gain. But, on closer examination, the facts revealed that the transaction could not meet the required tests for such tax treatment. This court said in KVP Sutherland Paper Co. v. United States, 344 F.2d 377, 170 Ct.Cl. 215 (1965), that the three tests for determining whether gain of a taxpayer can be classified as long-term capital gain are: (1) The gain must be realized frcm a sale or exchange of property (this requirement was met by the conversion of Canadian money into American funds); (2) The property sold or exchanged must be a "capital asset" in the hands of the seller (this requirement was complied with, as the Canadian money was a capital asset); and (3) The property sold or exchanged must have been held for more than six months prior to the transfer (this test has not been met). It could be argued that to meet the third test the taxpayer held the "equivalent value" of the Canadian dollars for longer than six months prior to the reconversion, but this leads to difficulties. If it was held in United States dollars, they cannot be considered as capital assets. If it was held in personal investments, which the facts indicate was the case here, we are not informed as to the nature of the investments. It could be that he invested in other property on which he made a long-term capital gain, and, if that were true, to allow him long-term capital gain in the case before us would result in allowing him a double long-term capital gain on the same "equivalent value" of Canadian dollars. However, eliminating the hypothetical and confining ourselves to the facts before us, which we must do, it appears that the taxpayer has failed to meet the third test by showing that he held a capital asset for more than six months prior to the transfer (reconversion).

This brings us to the crux of the problem. It is admitted that when the taxpayer reconverted United States dollars for Canadian dollars in 1961, he was able to obtain the same number of Canadian dollars that were originally converted with fewer United States dollars than were acquired at the time of the original conversion. At that point he had made a gain or profit. This is true regardless of the payment of the Canadian debt. The parties are in agreement that the payment of the debt did not create the income. The plaintiff says in this regard:

\* \* \* [T]he economic gain is from the conversion of currencies and not from the extinguishing of the debt. [Brief of plaintiff at 14.]

The defendant says:

\* \* \* [T]he Government submits that the proper treatment is to characterize Mr. Gillin's economic gain as short-term capital gain since it was not the payment of the debt that gave rise to the income but, rather, the purchase of the foreign currency at more favorable exchange rates than those existing at the time the debt was created. [Defendant's main brief at 13–14.]

Since it is clear that the taxpayer made a profit or gain on the reconversion in 1961, the inquiry must be, did he use a capital asset which he had held for six months or longer in making the reconversion? The answer must be in the negative. He used American dollars. There is no proof he had held these dollars for six months or more, and, even if this were true, it would not help the plaintiff, because currency of the United States is not a capital asset, as pointed out by the majority opinion. From all of these facts, I reach the in-

316

escapable conclusion that the taxpayer's gain was a short-term capital gain on which he must pay income taxes.

From the standpoint of fairness, it would seem that the taxpayer would be entitled to treat his profit as long-term capital gain, since the entire transaction extended over a period of more than three years. Nevertheless, every avenue of approach to the problem leads inescapably to the conclusion that under the statutes and authorities there is no way to hold that the gain is long-term capital gain. This may seem unjust and inequitable, but there is no way to avoid it. Tax laws are enacted to produce revenue, and their application in many instances may result in unjust and inequitable situations.

I would hold that the taxpayer's gain was a short-term capital gain and includable in his gross income for 1961.